FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

00 JUN 14 ꞓꞓꞓꞓ

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **JAMES COE & MARY DINKINS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CV 99-PT-2699-E** |
| | ) | |
| **RON BERRY, d/b/a BERRY'S** | ) | |
| **BEAVER LOG HOMES, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

ENTERED

JUN 14 2000

## MEMORANDUM OPINION

This cause comes to be heard on defendant Ron Berry's ("Mr. Berry"), d/b/a/ Berry's

Beaver Log Homes ("Berry's"), motion for summary judgment filed February 18, 2000.[1]

### BACKGROUND

Plaintiffs Mary Dinkins and her husband James Coe were interested in having a log home

and hunting cabin constructed on property they owned in Clay County, Alabama. They

researched numerous log home companies, including Berry's. Plaintiffs visited the defendants'

operation in Missouri twice, viewing the mill and plant and other log houses Berry had built.

Dinkins Depo. at 27, 30. Mr. Coe specifically liked the way Berry's "put the logs together." Id.

After plaintiffs twice visited Berry's in Missouri, Mr. Berry came to the plaintiffs' property in

---

[1] Apparently the only claim is against Ron Berry. Ron Berry is the sole owner of a
corporation named Berry Wood Products, Incorporated. Berry Depo. at 6. Berry's Beaver Log
Homes is a division of Berry Wood Products, Incorporated. Id. at 9-10. Regardless, the court
will from time to time refer to the "defendants" and separately to Berry and the business.

November, 1997. While there, plaintiffs and Berry's entered into two contracts for a log home

and a log hunting cabin which plaintiffs wished to purchase. This litigation involves these

contracts and what they included or failed to include. The contracts, entered into on November

4, 1997, are identical except as to cost and size. One contract states:

> We, Berry's Log Homes, a division of Berry Wood Products, located at
> the above address, agree to supply the following stated materials for one (1)
> twenty (20) foot by thirty-two (32) foot house. The logs will be 8" pine logs of
> our standard manufacture. The kit will include the following:
> > 8" log kit
> > ...
> > Total $35,000.00 [crossed out and handwritten in $30,000.00]
> > ...
> > Delivery
> > Berry's Log Homes will not be responsible for any weather damage
> > sustained to any materials that were ready to be delivered but could not be due to
> > customer's actions or inactions....
> >
> > ...
> > By signing below, all parties agree to the conditions herein described and
> agree to abide by this contract.
> > [signed by Mary A. Dinkins, each page initialed by James Coe]
> > [signed by Ron Berry]

Plaintiffs' Exhibit 2 (underlining in original) (this contract describes the log hunting cabin). The

second contract provides for supply and delivery of materials for one twenty-six foot by sixty-

four foot house (the log home). Plaintiffs' Exhibit 1. The total for this contract was listed as

$103,000.00, which had been crossed out and handwritten in was $100,000.00. At that time, Ms.

Dinkins and Mr. Coe paid Mr. Berry $85,000.00 total.

Mr. Berry testified in his deposition that this was a "turn-key" situation, meaning to him

that the house is ready to move in and includes appliances, light fixtures, and other products of

that nature. Berry Depo. at 16-19. Mr. Berry testified that "'Turn-key' is everything to build the

house, ready to move in." Berry Depo. at 23-24. Similarly, both Ms. Dinkins and Mr. Coe

2

believed that the cabin and house would be "turn-key," meaning to them that "when [Berry] was finished, we wouldn't have to do but very little finish work, that when they got through with it, it would be ready to walk into." Dinkins Depo. at 51. "It was also supposed to be turn-key, from day one; otherwise, we would never have gone with the building." Coe Depo. at 18.

> Q: ... Isn't it true that the contracts ... only require [Berry] to deliver the material?
> ...
> A: Well, the way I understand it, a turn-key was labor and all things, including appliances installed and electrical wiring and – turn-key, that's the way I interpreted that. Turn-key, you open the door and move in and live.

Id. at 36. However, Mr. Coe also admitted to the following:

> Q: ... Isn't it a fact that both contracts only require him to deliver merchandise to the site?
> ...
> A: Yes, sir.
> Q: And you read that before you signed it, didn't you?
> A: Yes, sir.
> ...
> Q: So you knew, when you signed this contract, the content of it?
> A: Yes, sir.
> Q: And you signed it anyway?
> A: Yes, sir.

Id. at 36-37.

> Ms. Dinkins testified as follows:
>
> Q: Now, tell me what you think Berry Log Homes failed to do in this contract.
> A: They didn't deliver merchandise when they said they would, one thing.
> Q: Okay. Anything else?
> A: Another thing, Mr. Berry told us he was going to come, when they brought the logs, he told us he was going to come and help stack them.
> Q: Okay.
> A: Well, he – and then if they ever did – were bringing them, then it ended up Grover was going to stack them. That isn't – what he said was going to happen never happened. Of course, we never got the logs anyway.

Dinkins Depo. at 70.

It was Mr. Berry's understanding that Mr. Coe was responsible for finding someone to actually construct the house and cabin. Berry Depo. at 27. Mr. Berry assisted Mr. Coe in that regard, referring Grover Francis to do the construction work. Id.

On December 20, 1997, Ms. Dinkins wrote to Mr. Berry, stating that they had received the plans for the buildings on December 12, and discussing potential changes. Plaintiffs' Exhibit 7. Shortly after entering into the agreement, Ms. Dinkins discussed the log cabin with her friend, Frank Andrus, who was familiar with log cabin homes through his own experience. Mr. Andrus faxed to Mr. Berry and Patricia Gilmore ("Pat"), the draftsperson working on the plaintiffs' project, employed by Berry's, numerous notes regarding the construction of Ms. Dinkins's and Mr. Coe's home and hunting cabin. See Plaintiffs' Exhibit 16 (faxes dated January 13, 16, and 26, 1998; and February 4 and 7, 1998).

According to Ms. Dinkins's contemporaneously taken notes ( Defendants' Exhibit 26 - unless otherwise noted, the following information comes from Def. Exh. 26), Mr. Berry informed the plaintiffs that he would return in January to check on their progress in preparing the site, and stated that he wanted to start building in late January or early February. Mr. Berry did not contact the plaintiffs or visit their property in January of 1998. Plaintiffs made numerous revisions to the plans for the log home. The month of February was spent working out the specifications for a loft plaintiffs decided to add to the home at Mr. Andrus's suggestion. The parties spent the month of March agreeing upon a price for the revisions, $19,000.00.[2] Ms. Dinkins requested Mr. Berry to put this figure into writing, but he never did.

---

[2] This brought the total price to $149,000.

4

In April, 1998, Pat told Ms. Dinkins that Mr. Berry would visit the property to view the site again. Mr. Berry did visit on April 21st. At that time, Mr. Berry informed the plaintiffs that he would be ready to start in two weeks. However, plaintiffs discovered that it would take four weeks to have the property wired for power. Ms. Dinkins informed Pat of this fact. On May 1, 1998, Ms. Dinkins contacted Pat and told her they were ready to begin. Pat informed Ms. Dinkins that a new beginning date had been set for June 29, 1998. Ms. Dinkins called Pat on June 22nd and again on June 26th, and discovered that Berry was running late and could not come to the property until July. On July 2, 1998, at 10:00 p.m., Mr. Berry called Ms. Dinkins and informed her that he would visit the property either Sunday night or Monday morning, July 5th or 6th. However, Mr. Berry did not arrive as scheduled, nor did he call the plaintiffs. Ms. Dinkins called Pat on July 6th and 7th to find out what happened. She was told that the trucks were being loaded and were coming.

Ms. Dinkins called Berry's on Friday, July 10, 1998, to confirm when their material would arrive. On this call, she spoke with a man who told her that they had loaded two trucks with logs and Mr. Berry was going with these loads. However, no logs were delivered to the plaintiffs' property at that time. Plaintiffs called the defendants again on July 13th and July 16th to find out "what was going on and when are you coming." Defendants informed plaintiffs that Mr. Grover Francis ("Grover") would visit the property on Friday, July 17th at night. Grover and a worker named Jason did arrive as scheduled and worked on the property until July 23rd. It appears that plaintiffs paid Grover $3,800 for this work. When they left, Grover informed plaintiffs that he would return on August 6th or 9th to continue work. However, he did not return as scheduled. Ms. Dinkins called Pat about this, who informed her that Grover would

5

arrive on August 10th.  Grover did not arrive as scheduled on August 10th.  Ms. Dinkins called

Grover's home on August 13th and was informed by his wife that Grover was in Tennessee and

to call back on Saturday to speak with Grover.  Ms. Dinkins called back as directed, but was

unable to reach Grover.

A handwritten note of unknown origin dated July 27, 1998, initialed R.B. at the top,

states:

> Mary Dinkins wants:
>
> ...
>
> Statements signed by Ron
> - $19,000.00 will cover all extras
> - Labor will be paid as completed
> - Labor will be paid out of agreed total (explain to Grover and Jason)
> - Mary is cleared of all liability concerning any personal injuries sustained by workers on job
> - List of labor by performance what is done and what it costs
> - Statement that material which has been delivered has been paid for
>
> "Not paying for anything if statements are not signed."

Plaintiffs' Exhibit 9 (emphasis in original).

On August 14, 1998, Ms. Dinkins contacted Pat, who informed Ms. Dinkins that a truck

with material would arrive at the property on August 17th or 18th.  However, that truck never

arrived.  On August 20th, plaintiffs were informed by someone at defendants' business that a

load was ready for delivery.  However, that load never arrived.  On August 21st, Ms. Dinkins

contacted Pat who informed Ms. Dinkins that they should receive a load on Monday, August

24th, or Tuesday, August 25th.  On August 25th, no materials had been delivered.  Ms. Dinkins

then called Pat and told her to tell Mr. Berry that they wanted their money back if he did not have

the time to build their house and cabin.  Ms. Dinkins also informed Pat that they may hire an

attorney who might contact Mr. Berry.  Following this conversation, Mr. Berry's son Glen called

Ms. Dinkins.  Glen informed Ms. Dinkins that he had spoken with his father, and that they would

"work with us to get the house and cabin built."  He also told Ms. Dinkins that they would

probably get a load on Monday, August 31st.  On August 26, 1998, a note is made by an

unnamed person concerning conversation with Ms. Dinkins.  The note states in pertinent part:

> 1:30-2:00 I told her I would be handling her house from here on out.  That Ron
> was having to work in the Sawmill.  She didn't seem to have a problem with this.
>
> She said that Grover and Jason left on the 24th of July.  They told her that the
> lumber that was there was junk and they had to come after more.  They told her
> they would be back on the 6th or the 9th of August.  They never showed and
> nobody called.
> She said she has been told they would be there on Monday - No Show - No Call
> and that this has been going on over a month, all the way back to June.
> ...
> She wants to know how long before the cabin is dried in.
> She wants to know how long before the house is dried in.
>
> She needs a statement from us and Grover that she is not responsible for any
> personal injuries sustained by workers for us or Grovers employees.
> She needs a performance list on labor done compared to what it cost and money
> paid - she said she would pay the labor as it was completed.
> She also wants something stating that the labor she is paying is coming off the
> total for the house.
> She wants a statement that the material that has been delivered is paid for.
>
> I told her we would try to have a load down there by Monday 8-31-98 and another
> if needed by 9-4-98.  I told her the problem right now is the trucking company.

Plaintiffs' Exhibit 8.  On August 28, 1998, a note was made by an unnamed person concerning a

conversation with Ms. Dinkins.  The note states in pertinent part:

> I need to go over the following when I call.
> ...
> The joist turning black won't hurt.  They are still good.  If the black is a problem
> we can bleach them and they will clean up.
> Grover was supposed to come by Tuesday he never showed.  If he does not come
> by this weekend I'm going to pull another carpenter off another job to come
> down.  If Grover comes he should be there no latter [sic] than Tuesday, Sept. 1st.

> If the other carpenter comes, it could be the end of the week.
> We will be there with a load by the time the carpenters are there, permitting I can
> get a truck here and loaded on Mon. or Tues.. I still do not have a conformation
> [sic].
> ...
> I told her all the above. I also told her we would try to have the cabin done before
> deer season (it is in Oct.).
> ...
> She also needs a statement that "$19,000.00 will cover all the extras"
> ...

Plaintiffs' Exhibit 8.

No shipment arrived on August 31st as scheduled. Ms. Dinkins phoned Glen that same

day, and he told Ms. Dinkins that he hoped they would get a load by the end of the week, i.e. by

September 4, 1998. On August 31, 1998, a note was made by an unnamed person concerning a

conversation with Ms. Dinkins. The note states in pertinent part:

> I need to go over the following:
> ...
> Grover did not show up over the weekend. I talked to Ron he said that we would
> have some body down there no latter [sic] than the end of the week.
> ...
> I still cant give you a dried in date on the house because of the delay in getting
> down there. When the carpenters get there and we see how they get along I will
> give you a dried in date. Ron said he things we can have the cabin dried in before
> Deer season.
>
> She said that deer season is Oct. 15th.
> I told her we would try to have the cabin done by then.
> ...

Plaintiffs' Exhibit 8.

On September 3, 1998, Ms. Dinkins called Pat to see what, if anything, she could

discover. Pat told Ms. Dinkins that Grover would be at the property on Wednesday, September

9th. On September 3, 1998, a note was made by an unnamed person concerning conversations

8

with plaintiffs.  The note states in pertinent part:

> I was supposed to call Marry [sic] on 9-1-98 or 9-2-98, I did not call.
> Grover came the morning of the 3rd, He said he had talked to Jim and that every
> thing was OK for him to go.
> Jim called me on the 3rd and wanted to know what was going on.  The logs and
> crew was supposed to be there and they had not showed up.  He was a little upset.
> I was confused.  I ask him if he hadn't talked to Grover.
> He said he had talked to Grover but that Grover hadn't said anything about there
> being a delay.  He said that Grover told him we had not even started on there [sic]
> house, and that he (Grover) was waiting on us to quit screwing around and get the
> stuff down there.
> I told Jim that I did not know where Grover got his information, but we had the
> last of the material for first load ready to be delivered.  I told him that the truck
> was supposed to be here to be loaded today but I called and delayed it because
> Grover could not be down there until Mon. the trucking company will not deliver
> with out somebody there to help unload.
> He said he wanted somebody down there working on his house by the 8th or they
> were considering asking for there [sic] money back.
> I told him we should be there Mon. morning.

Plaintiffs' Exhibit 8.  No shipment arrived by September 4, 1998.  Ms. Dinkins called Glen

about the lack of shipment, and said that they were "fed up with them and ready to get our money

back."  Glen called Ms. Dinkins on September 9th and informed her that Grover was on his way,

that they would get their first shipment on Friday, that the second truck would arrive one week

later with more material, and that the third truck would arrive one week after the second with

more material.

Grover did arrive on September 9th, but left on September 10th at 5:00 p.m. because no

material had arrived for him to work with.  Before leaving the property, Grover contacted Pat,

who informed him that the load of materials would arrive on the following Tuesday.  On

September 9, 1998, a note was made by an unnamed person concerning a conversation with Ms.

Dinkins.  The note states in pertinent part:

9

> I have to call Marry [sic] and tell her the truck never showed up.  The trucking
> company said there [sic] driver must have been delayed do [sic] to Mon. being a
> holiday, but that he would definitely be here Tues..  This is Wednesday and I still
> have not seen the truck.  I am looking for another trucking company to bring the
> house.  I am having trouble finding a company that will deliver before Friday.  I
> have not called because four of our guys didn't show up Mon. or Tues.. And dad
> and I had to work in the mill....

Plaintiffs' Exhibit 8.

On September 10, 1998, Mr. Berry phoned Mr. Coe at about 8:00 p.m., informing Mr.

Coe that the first truck would arrive at 7 or 8:00 a.m. on Monday, September 14, 1998.  Mr.

Berry phoned Mr. Coe again on September 11th and confirmed this information.  On September

14th, the shipment of material did arrive and was unloaded in approximately two hours.  That

day, Mr. Coe phoned Glen and told him that the truck was unloaded and that a helper wanted

$20.00 for helping, which Glen okayed.

On September 17, 1998, Mr. Coe called Glen and informed him that they had contacted

the St. Louis Bar Association and that if they didn't receive the rest of their material in a timely

manner, then "he would hear from them."  That same day, Mr. Coe spoke with Grover who

informed Mr. Coe that the logs were at the mill now, and that he thought they would get their

logs perhaps as early as Monday, but not before September 26th.  On September 17, 1998, a note

was made by an unnamed person concerning conversations with Mr. Coe.  The note states in

pertinent part:

> I have talked to Jim some time between the 3rd and today but I don't
> remember when.
> Ron has talked to him, also, They had a good visit.  Jim said he wanted the
> house done first.  Ron told Jim we should have the house dried in within six
> weeks.  We were supposed to call and let them know what time the truck was
> going to be there on Monday.  We did call them every thing was fine.  Ron agreed
> to have Jim hire some body to held unload the truck.  Jim called and said the man

charged $20.00. I told him that was fine.

      Jim called today (some time in the A.M.) And asked what was going on. I asked him what he meant. He said he had not heard from Grover. I told him I would find Grover and call him back.

      I went and talked to Ron, He said he had not got a hold of Grover, and told me to.

      I called and left a message on Grover's answering machine (around 10:30) for him to call me back.

      Jim called me back about 12:00. He was not friendly  He wanted to know why I had not called him back.

      I told him I had not talked to Grover, but he was supposed to call me.

      ... Jim also told me that he an Mary had contacted the Missouri Bar Association to find an attorney. Jim said this is taking to [sic] long and they just want to get there [sic] house down in a timely manner.

      ... I also told him that Grover was trying to put all the blame on us.

...

Plaintiffs Exhibit 8.

On September 22, 1998, Mr. Coe called Pat, who informed him that they were waiting for

Grover to arrive before sending any more material to the property. Pat also stated that if Grover

did not arrive soon, they would send someone else. On September 29, 1998, Ms. Dinkins called

Grover to find out when he might arrive at the property. Grover informed Ms. Dinkins that he

would speak with Mr. Berry concerning getting another load of materials to the property. Ms.

Dinkins called Grover the next day, September 30th. He said that he would come to the property

Thursday night or Friday morning, and that Mr. Berry would try to have another shipment of

material at the property by Friday, October 2, 1998.

On October 1, 1998, Mr. Berry wrote to Ms. Dinkins, enclosing a list of labor charges for

the house and cabin, and stating that she would not be held liable for any personal injuries

sustained by workers on the job. Defendants' Exhibit 33.

On October 2, 1998, Grover and Jason arrived at the property sometime after midnight.

11

They worked Saturday through Wednesday with the second load of materials which had arrived. The third load of materials had not arrived, and Mr. Berry informed plaintiffs that it would be delivered to the property by October 7, 1998. The load did not arrive as scheduled, so Grover and Jason left the property on October 8th. Plaintiffs were informed that the third load of logs would arrive on Monday, October 12th.

On October 11, 1998, Mr. Coe called Mr. Berry at his home and was told that the load would be delivered to the property by the end of the week. On October 15th, Mr. Coe called Berry's and spoke with Glen who said that a truck was not ready for delivery. On October 18th, Mr. Coe called Mr. Berry, leaving a message for him to call. Mr. Berry did not return the phone call. On the same day, Mr. Coe called Grover, who informed Mr. Coe that they would probably get a load of material by the end of the week, as they had a load ready for shipment.

On October 21, 1998, Mr. Coe spoke with Mr. Hamlin, plaintiffs' attorney, informing him of the past events, and requested that he write Mr. Berry a letter. That same day, Mr. Coe called Berry's and spoke with Pat. Pat informed Mr. Coe that the logs would be delivered by Glen and Grover on Monday. No shipment arrived and no one called the plaintiffs. On October 26, 1998, Grover informed Mr. Coe that they had a load of logs ready for delivery, but that they did not have a proper license for the truck, and so could not yet deliver the materials. On October 29th, Mr. Coe called Berry's, but no one answered the phones.

On January 6, 1999, Ms. Dinkins wrote to the Better Business Bureau in St. Louis, Missouri. Defendants' Exhibit 32. In that letter, she complained about Ron Berry and his business, summarizing her dealings with defendants.

Eventually, Mr. Berry asked Grover to finish the job for the plaintiffs:

12

> To get the matter resolved without having problems, I talked to Grover and asked
> him if he would come down and just take the house and finish it for Jim and
> Mary, and he said he would. And I was to ship the remainder of the materials that
> we manufactured, and he was going to take the remainder of the money and
> purchase the materials that we didn't manufacture and finish the house.

Berry Depo. at 31. On January 7, 1999, Mr. Berry wrote to Ms. Dinkins and Mr. Coe, stating the

following:

> Because we have fallen so far behind in the construction of your home and cabin,
> we are planning to turn your contract over to Grover Francis for fulfillment.

> He had planned to be there sometime this week to work, but has been delayed by
> extreme winter weather conditions in this part of the country, as well as other job
> commitments.

> Our company will not apply any further charges for materials for our manufacture
> (logs, beams, etc.) you are owed for the completion of your homes. Any
> monetary negotiations for materials not included in contract will be between you
> and Grover.

> We are offering this arrangement as being the most effective way of getting your
> buildings completed. We apologize for all of the delays.

Plaintiffs' Exhibit 5. Plaintiffs did not respond to this offer.

Mr. Berry testified that he never shipped the remainder of the materials which his

company had manufactured, but which plaintiffs had paid for, because Grover complained to him

that the plaintiffs had not paid him for some work done and because of his assessment that the

materials would deteriorate if delivered. Berry Depo. at 35-43, 49, 58.

> Q: So you're saying that they've received approximately $40,000 of materials
> from you?
> A: Yes, sir.

Id. at 38.

> Q: But they had given you $85,000?
> A: Yes, sir.

13

> Q: And you had only sent them, at best, $40,000 of materials, correct?
> A: Yes, sir.  Yes, sir.

Id. at 43.

> Q: And you haven't sent them any materials, even though they've paid you a
> substantial amount of money, outside of what you originally sent them, correct?
> A: Yes, sir.
> Q: And I take it you don't intend to send them any more materials?
> A: The materials are sitting on my yard.
> Q: Well, how long are they going to sit there?
> A: Until we get this resolved.

Id. at 49.

> A: They called me and said they wouldn't pay another dime until the house was
> completely done, and we just stopped.

Id. at 50.  However, Mr. Berry contradicts his own testimony in his affidavit, dated March 21,

2000, wherein he states that "[t]he amount of materials shipped was roughly the monetary

amount of plaintiffs down payment[, $85,000]."

> The plaintiffs deny having stated that they refused to pay anymore money:

> Q: ... Was there a time that you or your wife told Berry Log Homes that they
> weren't going to get any more money until the houses were complete?
> A: No, sir, I don't believe so.

Coe Depo. at 31.  However, Mr. Coe also stated that they wouldn't pay the balance until more

work had been done.  Id. at 32.

Plaintiffs filed suit on August 19, 1999, in the Circuit Court of Clay County, Alabama,

alleging breach of contract, fraud, and conversion.  Defendants removed the case to this court on

October 7, 1999.

## DISCUSSION

### A. Standard for Summary Judgment

14

Summary judgment may be granted based upon facts developed during the administrative proceedings, the pleadings, discovery, and supplemental affidavits if together, they show that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. Id. The non-moving party then bears the burden of showing that there are specific facts demonstrating that there is a genuine issue of fact for trial. Id. at 324. "When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." Korman v. HBC Florida, Inc., 182 F.3d 1291, 1293 (11th Cir. 1999). The trial court must resolve all reasonable doubts in favor of the non-moving party, but need not resolve all doubts in a similar fashion. Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 609 (11th Cir. 1987).

**B. Analysis**

Plaintiffs have sued the defendants for breach of contract (Count I), fraud (Count II), and conversion (Count III). Defendant Berry's Beaver Log Homes counterclaimed for the balance due on the contracts with plaintiffs in the amount of $64,000.[3] The parties agree that Alabama law applies.

**1. Breach of Contract**

Defendants contend that the almost identical contracts, entered into on November 4,

---

[3] $149,000 [total cost] - $85,000 [down payment] = $64,000 [balance].

1997, between the plaintiffs and defendants, are clear and unambiguous: they provide for the supply and delivery of specified material, do not mention or in any way provide for labor or other services, nor do they reference the construction of the buildings. As such, defendants argue, the plain meaning of the terms of the contracts should rule, and no parol evidence should be considered by this court in construing the meaning of the contracts. Furthermore, defendants assert that Berry's refusal to ship additional materials which defendants had produced and which plaintiffs had paid for was done in accordance with what they claim to be their legal duty to mitigate damages.

Plaintiffs contend that there are four reasons why defendants' motion for summary judgment on the breach of contract claims should be denied. First, plaintiffs assert that the terms of the contracts "indicate" that the contracts were for a competed house and cabin. Specifically, plaintiffs assert that because the list of items to be delivered under the contracts included such materials as windows, one bath, and a ceiling fan, logic allegedly dictates that construction of the building is clearly implied, i.e. that the cost, $149,000, for just the materials, is simply ridiculous. Second, plaintiffs assert that Mr. Berry admitted during his deposition that the contracts were for a completed house and cabin. Third, plaintiffs assert that the correspondence from defendants to plaintiffs establish that the defendants knew that they were responsible for the construction of the house and cabin. Finally, plaintiffs assert that, if the previous three arguments are unconvincing to the court, the terms of the contracts are ambiguous, favoring construction in plaintiffs' favor.

The Alabama Supreme Court has made clear its position on contract construction. A court must enforce an unambiguous, lawfully entered contract, just as it is written. See Phelps v. Dan Tucker Auto Sales, Inc., 718 So.2d 33, 35 (Ala. 1998) (citing P & S Business, Inc. v. South

16

Central Bell Telephone Co., 466 So.2d 928, 931 (Ala. 1985)). When interpreting a contract, a court should ascribe the ordinary, natural, and plain meaning of words to the terms of the agreement. Id. at 36 (citing Pacific Enterprises Oil Co. (USA) v. Howell Petroleum Corp., 614 So.2d 409 (Ala. 1993)). A court should further presume that the parties intended what the terms of the agreement clearly state. Id. "[W]hen the parties reduce their agreements to writing, the writing – in the absence of mistake or fraud or ambiguity – is the sole expositor of the transaction and the intention of the parties." Smith v. Citicorp Person-To-Person Financial Centers, Inc., 477 So.2d 308, 310 (Ala. 1985) (quoting Joseph v. Hopkins, 158 So.2d 660 (1963)).

"Whether a contract is ambiguous is a question of law for the trial court to determine." P & S Business, 466 So.2d at 931. A contract is unambiguous if only one reasonable meaning emerges from its words. See Voyager Life Ins. Co., Inc. v. Whitson, 703 So.2d 944, 948 (Ala. 1997) (quoting Wayne J. Griffin Electric, Inc. v. Dunn Construction Co., 622 So.2d 314, 317 (Ala. 1993)). "When any aspect of a contract is capable of more than one meaning, it is ambiguous." Id. However, a court should refrain from inserting ambiguities into a contract through a "strained and twisted" interpretation of its terms. P & S Business, 466 So.2d at 931; see also John Hancock Mutual Life Ins. Co. v. Schroder, 180 So. 327 (Ala. 1938).

In this case, it is virtually uncontested that the terms of the contract are unambiguous. Mr. Coe testified as follows:

> Q: ... Isn't it a fact that both contracts only require him to deliver merchandise to the site?
>
> ...
> A: Yes, sir.
> Q: And you read that before you signed it, didn't you?
> A: Yes, sir.
> ...

17

Q: So you knew, when you signed this contract, the content of it?
A: Yes, sir.
Q: And you signed it anyway?
A: Yes, sir.

Coe Depo. at 36-37. Furthermore, a look at the terms of the contracts bears this out. The

contracts clearly state that certain specified goods will be supplied and delivered. No mention is

made of construction of the house or cabin. By the terms of the contracts, Berry's simply agreed

to provide certain log cabin supplies to the plaintiffs for an agreed upon price. The court notes

that the contracts are poorly written, as they fail to specify any time lines for delivery or

payment. The contract is unambiguous in its terms: Berry's did not agree within the four corners

of the contracts to construct the house and/or the cabin. Rather, Berry's simply agreed to supply

and deliver the materials needed to construct the house and cabin. Plaintiffs' arguments and

evidence to the contrary falls outside the four corners of the contracts. However, this is not the

end of the query. The question remains as to whether Berry's breached the contracts by failing to

deliver the goods plaintiffs had paid for in accordance with the contracts.

To prove a breach of contract, a claimant must show (1) the existence of a valid contact

binding the parties in the action; (2) his or her own performance under the contract; (3) the

defendant's nonperformance; and (4) damages. See Southern Medical Health Sys., Inc. v.

Vaughn, 669 So.2d 98, 99 (Ala. 1995) (citing McGinney v. Jackson, 575 So.2d 1070, 1071-72

(Ala. 1991); Seybold v. Magnolia Land Co., 376 So.2d 1083, 1085 (Ala. 1979); Hanby v.

Campbell, 132 So. 893, 894 (Ala. 1931)). In this case, there are two valid contracts, plaintiffs

had partially performed under the contracts, the defendants arguably failed to deliver materials as

promised, and plaintiffs have suffered damages. The court cannot determine as a matter of law

18

wheter defendants breached the contracts.  This is a question proper only for a trier of fact.

Berry's contends that it mitigated its damages by refusing to deliver goods for which plaintiffs had already paid.  However, Berry's does not explain how its damages are mitigated by failing to deliver goods which plaintiffs have admittedly paid for in full.  Furthermore, whether or not the plaintiffs anicipatorily repudiated the contracts, defendants' purported basis for mitigating their damages, is disputed as a matter of fact.  According to defendants, plaintiffs stated that they refused to pay another cent until both buildings were constructed and complete.  According to plaintiffs, they don't recall making this statement, but rather that they stated that they wouldn't pay any more money beyond the $85,000 until more work had been done.

"For a party's acts to constitute an anticipatory repudiation, the acts must at least amount to an unqualified refusal, or declaration of inability, substantially to perform according to the terms of his [or her] obligation."  Cunningham v. Langston, Frazer, Sweet & Freese, P.A., 727 So.2d 800, 805 (Ala. 1999) (citing Draughon's Business College v. Battles, 50 So.2d 788, 790 (Ala. Civ. App. 1951) (quoting Mobley v. New York Life Ins. Co., 295 U.S. 632, 638 (1935)) (internal quotation marks omitted).  In this case, whether there is an unqualified refusal on the part of plaintiffs is factually unclear.

More importantly, defendants cannot take advantage of a situation which they themselves helped to create through their own conduct.  See Gradco, Inc. v. St. Clair County Bd. of Educ., 477 So.2d 365, 368 (Ala. 1985) ("[A] party to a contract who has caused a failure of performance by the other party cannot take advantage of that failure.") (quoting Dixson v. C. & G. Excavating, Inc., 364 So.2d 1160, 1162 (Ala. 1978)).  Mr. Berry admitted in his deposition that plaintiffs had paid $85,000 and had received only $40,000 in materials (contradicted in his

affidavit).

Defendants assert in their brief that plaintiffs breached the contracts by not paying more than $85,000. However, the language of the contract does not explicitly discuss or even allude to a payment schedule. Mr. Berry in his affidavit states that at all times relevant to the contract, Berry's has been ready, willing, and able to deliver the balance of the materials due under the contract. The history of the dealings between these two parties casts considerable doubt onto Mr. Berry's certitude in this statement.

In sum, there are material factual disputes as to whether either party or both breached the terms of the contracts.

Mr. Berry asserts additionally that he, personally, should be dismissed from this count as he did not enter into a contract with the plaintiffs, only Berry's did. Plaintiffs argue that discovery into the question of whether they can "pierce the corporate veil" and hold Mr. Berry responsible is unfinished at this time. However, as defendants point out, the discovery cutoff as set by this court has expired.[4] The court will, however, reserve ruling on this issue.

### 2. Fraud

In Count II of their complaint, Plaintiffs allege that Mr. Berry "represented to the Plaintiffs, that the Defendant had the present ability and intent to manufacture, supply and deliver logs and other materials necessary for the erecting two log homes and that the Defendant, Ron Berry, would procure, produce and deliver the log materials upon receipt of $85,000."

---

[4] The discovery deadline was originally set by this court on November 5, 1999 for March 6, 2000. On November 18, 1999, the court extended the discovery deadline by 45 days to April 20, 2000.

Defendants assert that the plain language of the contracts does not provide that all materials will be supplied and delivered upon the down payment of $85,000. Rather, it provides that all the materials will be provided after receipt of, in total, $149,000.[5] Defendants further argue that plaintiffs have never contended that the contracts were induced by fraud.

Plaintiffs argue that it is fully admitted by both parties that $85,000 was paid, and that plaintiffs have not received anything near $85,000 worth of materials contracted for. Furthermore, plaintiffs assert that they have alleged fraud in the inducement, i.e. that they entered into the contract believing that it included construction costs.

Typically, to prove fraud a plaintiff must show that the defendant made a false representation of a material fact and that the plaintiff relied upon the false representation to his detriment. See National Security Ins. Co. v. Donaldson, 664 So.2d 871, 876 (Ala. 1995) (citing Harmon v. Motors Ins. Corp., 493 So.2d 1370 (Ala. 1986)); Ala. Code § 6-5-101 (1975). In this case, plaintiffs contend that Mr. Berry misrepresented to them that they were bargaining for a "turn-key" home and cabin. However, it is unclear how plaintiffs can claim that they relied upon that statement to their detriment where they read the contract, were aware of its contents including the fact that the contract does not mention in any way construction of the cabin or house, or "turn-key" operations, and chose to sign it anyway. This claim will likely be dismissed at or before trial.

### 3. Conversion

Plaintiffs allege in their complaint that defendants have converted plaintiffs $85,000

---

[5] The contracts actually provide for payment of $130,000 total. As previously discussed, the parties orally agreed on $19,000 in additional supplies.

21

down payment to their own use. Defendants argue that Berry's performed its part by providing some materials for the construction of plaintiffs log home and cabin, and that they were excused from further performance after plaintiffs committed an anticipatory breach of the contracts. Specifically, defendants assert that defendants obligation to perform under the contracts ended when plaintiffs announced that "they would not pay another cent until Berry's delivered all of the materials specified and further constructed the homes to their satisfaction." Defendants' Brief at 11. Additionally, defendants claim that Berry's is entitled to retain the down payment under the theory of quantum meruit, asserting that they delivered and/or milled logs for plaintiffs under the contracts equal to the amount paid. Plaintiffs assert that according to Mr. Berry's own testimony, they received only $40,000 worth of materials from defendants. See Berry Depo. at 37-38.

"[T]he remedy of quantum meruit was developed as part of the common law of contracts to avoid unjust enrichment under a contract implied by law...." United States v. Metzger Towing, Inc., 910 F.2d 775, 781 (11th Cir. 1990). The total amount of logs produced, though not necessarily delivered, is alleged by defendants to be $85,000. Furthermore, defendants assert that these materials cannot be used for any other projects, as they were designed and cut according to the plaintiffs' unique specifications. These logs sit unused on Berry's property to date. The court will require further briefing on the conversion issue.

Plaintiffs will submit to the court within 10 days any Alabama cases which hold that conversion will lie with regard to funds voluntarily paid under contract.

## C. Conclusion

Based on the foregoing, the court will delay ruling on the defendants' motion for

22

summary judgment pending further briefing as discussed above.

This ___ day of June, 2000.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**